IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 18, 2007 Session

**CRAIG ROBERT NUNN v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-C-1622     Seth Norman, Judge**

_____

**No. M2007-00974-CCA-R3-PC - Filed August 18, 2008**

_____

The petitioner, Craig Robert Nunn, appeals the post-conviction court's denial of his petition for post-conviction relief from his aggravated sexual battery convictions. The petitioner first argues that the post-conviction court erred in finding that due process considerations did not toll the statute of limitations. He further argues that the post-conviction court, which also considered his claims on the merits, erred in finding that he received effective assistance of trial counsel. Following our review, we affirm the post-conviction court's denial on its merits of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. D. KELLY THOMAS, JR., J., filed a concurring opinion.

James A.H. Bell and Richard L. Holcomb, Knoxville, Tennessee, for the appellant, Craig Robert Nunn.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In January 1999, the petitioner pled guilty in the Davidson County Criminal Court to four counts of aggravated sexual battery in exchange for concurrent sentences of twelve years at 100 percent for each conviction. At the time the crimes occurred, the petitioner was a trauma surgeon at Vanderbilt Hospital in Nashville, where the four victims, three twelve-year-old girls and one ten-year-old girl, were hospitalized with critical illnesses. At the guilty plea hearing, the prosecutor recited the following factual basis for the pleas:

Your Honor, if called upon at trial, the State's proof would be as follows: That the four victims in this case were all children under the age of thirteen. Each were [sic] hospitalized at Vanderbilt Hospital, which is here in Davidson County[,] for serious medical conditions. The [petitioner] was not a doctor for any of the children.

Count One involves a child by the name of [S.V.],[1] who, if called upon at trial would testify that on 12-10-97 a man entered her room in a white lab coat. The man asked if she was wearing a bra or training bra and proceeded to touch her breasts. The person who appeared to be a doctor then left the room.

Count Three involves a child by the name of [M.B.], who . . . would testify that on the 12th of January, 1998, a man, similar to the description given previously by [S.V.] came into her room and touched her around her breast and pubic area.

Count Five represents a child by the name of [B.G.], who would testify that on the 11th or 12th of January, 1998, a man of also similar description, touched her on the pubic area as he pulled her panties down.

Count Nine involves a child by the name of [D.S.]. In regards to Count Nine [D.S.] would testify that on February 8th, 1998 a man, also of similar description, came into her room and digitally penetrated her vagina.

The prosecutor informed the trial court that police investigators, with the cooperation of Vanderbilt officials, had obtained videotape that showed the petitioner pulling the medical charts of the victims and entering their rooms. When questioned by the police, the petitioner made a statement in which he admitted he was sexually attracted to adolescent girls and had given "examinations" to the victims, who were not his patients.

On April 13, 2005, the petitioner filed a petition for post-conviction relief, which the post-conviction court dismissed as untimely. On appeal, the petitioner argued that the statute of limitations should be tolled because: (1) his guilty plea agreement contained provisions stating that he would not seek to withdraw or alter his guilty pleas in any way and would file no appeal or challenge to the convictions or sentences, and (2) his trial counsel informed him that he was waiving his right to both direct and post-conviction appeal by signing the guilty plea agreement. Craig Robert Nunn v. State, No. M2005-01404-CCA-R3-PC, 2006 WL 680900, at *1-2 (Tenn. Crim. App. Mar. 17, 2006). Finding that the record needed further development, this court remanded the case to the post-conviction court with instructions to hold an evidentiary hearing to determine "the circumstances surrounding the guilty plea, the advice given, and whether this precluded the [p]etitioner from filing a timely petition for post-conviction relief." Id. at *6.

---

[1] It is the policy of this court to refer to minor victims of sexual assault by their initials.

In his post-conviction petition and in this current appeal, the petitioner alleges that trial counsel was ineffective for failing to properly advise the petitioner of the maximum possible sentence he would receive if convicted of all counts at trial; failing to adequately investigate the allegations in the indictment, including whether the petitioner suffered from a mental disorder relevant to his defense and whether the facts alleged by the victims were consistent with the petitioner's condition; failing to properly advise the petitioner about the impact of the unavailability of two of the victims at trial; and failing to properly advise the petitioner about the trial court's ability to enhance the sentences based on factors that were not found by the jury. The petitioner additionally alleges that the cumulative effect of the above errors resulted in his being deprived of the effective assistance of trial counsel.

At the September 22, 2006 evidentiary hearing, the petitioner testified that he hired trial counsel in the spring of 1998 and pled guilty in January 1999. To his knowledge, trial counsel did not file any evidentiary or pretrial motions on his behalf. Trial counsel also failed to retain an investigator, interview witnesses, or have the petitioner undergo a forensic evaluation by a psychiatrist or psychologist. The petitioner said that he was seeing a psychiatrist at the time for depression but was not evaluated with respect to any possible mental or medical condition that would have been relevant to the case. The petitioner testified that trial counsel informed him that he was likely to receive 108 years if the case proceeded to trial, telling him that a trial was a "huge risk," and that the trial judge would run all his sentences consecutively, which meant that he would die in prison. The petitioner said that this information, which made him feel "[s]ick," was a motivating factor in his decision to accept the State's offer of a twelve-year sentence at 100 percent.

The petitioner testified that he reviewed the evidence against him but did not recall having a "whole lot of discussion" with trial counsel about it. Trial counsel did, however, tell him that his statement to police could be considered a confession, a characterization that the petitioner did not believe to be accurate. The petitioner said trial counsel explained the charges against him and told him that he could be convicted for each separate contact with an individual victim even if the contacts occurred at the same time. Trial counsel also told him that the separate counts could "very well stand." The petitioner testified that trial counsel did not investigate the medical condition of the victims, two of whom were in grave condition and had since died, to ascertain whether they would be able to testify against him at trial. He said that trial counsel told him that the victims' serious illnesses made them likely to be perceived in a more sympathetic light. The petitioner testified that when he asked before sentencing about a possible reduction in his time, trial counsel told him that his guilty plea included a waiver of his rights to attack the plea agreement or to appeal in any way. He said he took that to mean that "it was set in stone and it was done and [he] couldn't appeal."

The petitioner testified that trial counsel told him that he would remain his attorney until the petitioner completed his sentence at the Department of Correction, or for approximately ten years. In addition to representing him in the criminal case, trial counsel represented him in the civil suits that arose out of the incidents and continued his representation in that capacity through 2005. The petitioner said that trial counsel visited him in prison many times, including more than a year after

the entry of his guilty pleas, to discuss both the criminal and civil cases. In addition, trial counsel, on several occasions, asked him to review and evaluate other medical malpractice cases for him and his firm, which the petitioner did free of charge.

The petitioner testified that he did not learn about the possibility of filing a post-conviction petition until the middle of 2004 when post-conviction counsel first became involved in his case; up until that time, he did not know that his guilty pleas did not preclude him from raising issues of ineffective assistance of counsel or prosecutorial misconduct in a petition for post-conviction relief. He said that trial counsel told him that he had waived all his rights by entering his guilty pleas. Trial counsel never mentioned anything to him about his right to file a petition for post-conviction relief or about the one-year statute of limitations for doing so. The petitioner testified that he therefore interpreted the provision in his guilty plea agreement that stated "no appeal or challenge to said conviction is maintained by Craig Nunn" to mean that "it was over for good and [he] wouldn't be able to do anything about it, ever." Had he known he had the right to file a post-conviction petition, he would have done so within the first year of entering his guilty pleas.

On cross-examination, the petitioner testified that post-conviction counsel informed him that the 108 years trial counsel had led him to believe he would receive if convicted at trial was an "outrageously high" estimate. He said that he was never particularly satisfied with his plea agreement. Although he had "voyeuristic tendencies . . . that were probably inappropriate," he was not guilty of aggravated sexual battery and thought that he could have received a sentence involving some sort of treatment, instead of incarceration, had his trial counsel investigated his case more thoroughly. He said he did not hire another lawyer, despite not being happy with trial counsel's advice, because he had been told that trial counsel was the best lawyer in Middle Tennessee. He acknowledged that he was aware of other inmates filing post-conviction petitions but said that he assumed, based on what trial counsel told him, that his own guilty plea agreement included a waiver of his right to petition the court for post-conviction relief. Upon further questioning, the petitioner testified that he did not become dissatisfied with trial counsel's representation until he learned from his post-conviction counsel in 2004 that he had the right to file a post-conviction petition. He explained, however, that he was not familiar with the law and had not realized until 2004 that there were issues such as the multiplicity of the indictment and the voluntariness of his statement that trial counsel had failed to pursue.

Dr. Fred Berlin, a specialist in forensic psychiatry with expertise in the area of sexual disorders, testified that he interviewed the petitioner on August 18, 2006. He also reviewed the record of the petitioner's case, including the petitioner's statement to police, the allegations made by the victims, the indictment, and the plea agreement. From his review, he noted two things which suggested that the petitioner should have been evaluated by a forensic psychiatrist to determine whether he had a psychiatric disorder relevant to his defense. First, the petitioner was a successful trauma surgeon in his mid-thirties who, "out of the blue," began to examine young females in a pediatric unit who were not his patients. Second, the petitioner informed the interviewing police officer that he knew he had a problem, wanted treatment, and had even discussed the issue with some friends, but that he had managed to control himself over the years until the recent events transpired.

Such irrational behavior, in Dr. Berlin's judgment, indicated that the petitioner should have undergone a thorough psychiatric assessment.

Dr. Berlin testified that he diagnosed the petitioner as suffering from voyeurism, a category of sexual disorder in which "the afflicted individual experiences intense recurrent erotically arousing . . . fantasies and urges about looking at an unsuspecting, naked stranger." He said that for such an afflicted individual, the act of looking, in and of itself, provides the sexual excitement; "generally no sexual activity with the observed person is sought." According to Dr. Berlin, what was particularly arousing to the petitioner was viewing the pubic area of someone that he believed to be virginal. He said that the petitioner's statement to the police, in which he repeatedly said that he was aroused simply by the act of looking and had not touched the victims in a sexual way, was consistent with a diagnosis of voyeurism:

> Yeah, he was touching them without permission so I don't want to say that's okay. But there is no evidence, from the psychiatric perspective that the touching was erotically, sexually arousing. What was arousing for him was the act of looking, being a physician and going in there, actually doing a medical exam was a way he could look, he hoped, without causing any distress to these individuals. But if my diagnosis of voyeurism is correct, and as I said, I have within reasonable medical certainty come to that conclusion, that the arousing part for him was the voyeuristic part and he has consistently said that over the years.
>
> At no point has he ever said or acknowledged that touching was erotically arousing to him.

Dr. Berlin believed the same diagnosis would very likely have been reached in 1999 had the petitioner been evaluated by a forensic psychiatrist with access to his complete record, as opposed to a treating clinician who may have never seen the police report of the incidents. He said he thought such a diagnosis would have been relevant at the guilt/innocence stage of the trial because it would have added credibility to the petitioner's claim that he had not touched the victims for sexual gratification. The diagnosis would have also made it less likely for the petitioner to be convicted on the counts of the indictment based on the allegations of S.V., who claimed that she had been assaulted by two men who came into her room together. According to Dr. Berlin, a diagnosis of voyeurism meant that it was "almost inconceivable that this would have been done in collusion with another person." He testified that he thought the diagnosis, including the information that the condition was amenable to treatment, would have been relevant to the trial court at sentencing. He said that there were "mental impairments, diminished capacity, both cognitive and volitional associated with a sexual disorder such as voyeurism" that could have conceivably been viewed as a mitigating factor. Finally, he thought that the petitioner "might have looked at his options very differently" had he known that the jury might "hear about voyeurism and conclude that this wasn't touching done for sexual reasons," which meant that "it might not have been so clear that he could [have] been convicted on an aggravated sexual battery charge."

-5-

Dr. Berlin testified that the petitioner showed signs of both cognitive and volitional impairment at the time of the incidents, as evidenced by the videotape of his walking back and forth in the hallway before entering the victims' rooms and by his statement to police, in which he spoke of being tormented by his urges and appeared to be attempting to rationalize his behavior. Dr. Berlin did not believe, however, that the petitioner's mental impairments qualified him for an insanity defense. On cross-examination, Dr. Berlin acknowledged that the victims' allegations of sexual touching, including touching of the breast and vagina, would not be consistent with a diagnosis of voyeurism. He further acknowledged to the post-conviction court that the petitioner had admitted the factual allegations, including the sexual touching, when entering his guilty pleas.

David M. Siegel testified that he was a professor of legal ethics at New England School of Law and a licensed attorney in Tennessee, Massachusetts, and the District of Columbia, although his license in the District of Columbia was currently inactive. He stated that the waiver of rights in the petitioner's guilty plea agreement, which included the condition "that no appeal or challenge to said conviction or sentence is maintained by Craig Nunn," presented a fundamental ethical problem because it was all-inclusive, containing no exemption to allow for a challenge to the guilty plea itself, the effectiveness of trial counsel, or prosecutorial misconduct. He said that such all-inclusive waivers were not enforced and, upon further questioning by post-conviction counsel, began to review several of the federal cases which have found similar waivers unenforceable. The post-conviction court interrupted to announce that it "whole heartedly" agreed, and post-conviction counsel then observed that it was his understanding that the use of such all-inclusive waivers in the guilty plea forms, which had been part of a "systemic problem," had since been eliminated.

Siegel testified that it is the responsibility of a criminal defense lawyer to investigate the possible mental health issues in any case. He said he thought it was essential to use an independent mental health expert rather than a treating physician or psychologist for a number of reasons. Among these were that "[t]he role of doing a forensic assessment may involve getting down to things that . . . [may] not [be] psychologically beneficial to the defendant"; a treating psychiatrist or psychologist does not need to look at the case file while such information is essential to a forensic psychiatrist; and a forensic psychiatrist's role is to work with the lawyer with respect to how the information he or she obtains can be used in court, a subject which is irrelevant to the treating psychiatrist. In addition, confidentiality issues were different in that the forensic psychiatrist, working as part of a defense team, "is not susceptible to the same sort of discovery" as the treating psychiatrist. Siegel said that the history of the petitioner's case "certainly raise[d] the issue" of whether he had a mental health problem. For that reason, he believed that trial counsel's failure to obtain an independent mental health expert to investigate the petitioner's mental health issues fell below the acceptable standard of care.

Trial counsel, a lawyer with over thirty years of experience, testified that he had spent three years doing appellate criminal work in the office of the State Attorney General followed by seven years in the district attorney's office in Nashville before entering private practice, where he focused almost exclusively on criminal cases. During that time, he had written several books, including the three-volume Tennessee Criminal Practice and Procedure. He stated that the petitioner hired him

in April 1998 after he had taken a polygraph test and given his statement to police but before he had been indicted. He and the initial assistant district attorney general assigned to the case had some limited discussions about discovery issues at the outset. That assistant district attorney later left the district attorney's office, and trial counsel then had an "enormous number of conversations" with the assistant district attorney who took over the case. The second assistant district attorney provided adequate discovery to him, including information about the names and ages of the victims, the videotape of the petitioner outside the victims' rooms, the petitioner's statement to police, and the results of the photographic lineups shown to the victims.

Trial counsel testified that the petitioner met with Dr. Paul Ragan, a Vanderbilt psychiatrist, who evaluated his competency to stand trial and treated him for his suicidal thoughts and depression. Based on his evaluation, Dr. Ragan determined that the petitioner was competent to stand trial and that an insanity defense could not be supported. Trial counsel stated that he was looking for anything to defend the case on its merits and that part of Dr. Ragan's evaluation included a determination of whether the petitioner was suffering from any sort of mental health issues that would be helpful to the defense. However, in trial counsel's professional opinion, the mental health issues uncovered by Dr. Ragan "would be not helpful to the extreme." Dr. Ragan told him that the petitioner "engaged in extraordinarily high risk activities to stimulate himself," had a "fascination with younger bodies and younger girls," and had married an Asian woman because "she looked like a young girl." Because such information was "consistent with what the State was suggesting," trial counsel believed it would be contrary to the petitioner's interest to pursue such a defense. Trial counsel testified that Dr. Ragan never used the word "voyeurism" and made no mention of the petitioner's interest in looking as opposed to touching. What he recalled, instead, was Dr. Ragan's discussion of the petitioner's interest in "sexuality as it related to young girls." Trial counsel testified: "Now, whether that was looking or touching, I don't think we ever got into that level of specificity. In my mind, . . . when he said he had some interest in young girls, whether it's looking or touching, I'm not going there." Moreover, the petitioner always maintained to him that his encounter with the girls was "one of an examination," which involved touching. Trial counsel said that the petitioner even admitted in his statement to police that he had taken a "groin pulse" on one of the victims.

Trial counsel testified that he fully discussed these issues with the petitioner:

> Well, we had multiple conversations throughout the representation. I was looking for anything to defend the case on the merits. As to his lack of intent, but we kept running off the proposition that he had made an inculpatory statement. I don't want to call it a confession, but he had certainly made an inculpatory statement, together with what the girls were saying happen[ed], was simply devastating. And so the issue then was how can I defend this on the merits, where I can twist in some sort of psychiatric or psychological evaluation or defense. And in my view, there was not enough substance to any kind of mental health defense, some sort of deviant mental health defense that I could use. Those sorts of defenses are extraordinarily dangerous, and unless you have a powerful defense or some very solid defense, they are fraught with disaster.

-7-

What Dr. R[]agan was telling me was precisely the kind of thing that [the petitioner] had said to the detectives, about engaging in high risk behavior or whatever. And that was certainly not helpful to me.

Trial counsel agreed that although the petitioner's statement to police did not rise to the level of a confession, it did not fall short of one by much either. He said he did not file a motion to suppress the statement but used every conceivable argument in his discussions with the assistant district attorney as to why the statement was deficient and should be suppressed. In the end, he believed that his threat to file a solid motion to suppress was what induced the assistant district attorney to make the offer she did. Trial counsel testified that there were significant arguments in favor of suppressing the statement but, based on his experience, he did not think he would have been successful with a motion to suppress. He, therefore, recommended that the petitioner accept the State's offer.

Trial counsel acknowledged he told the petitioner that he ran a huge risk of being convicted at trial and that the trial judge could give him such a lengthy sentence that he would spend the rest of his effective life in prison. He stated that he always informed clients of their theoretical or statutory maximum sentence, as well as what he believed the most probable sentence to be. In this case, he informed the petitioner both verbally and in writing that he thought, if convicted, the most probable result would be a sentence "somewhere in the 30 to 40 year range." He said he told the petitioner that he did not think the State would succeed in proving the penetration required to convict him of rape but that he could be convicted of four counts of aggravated sexual battery and that the trial judge could run some of the sentences consecutively. Trial counsel said he believed the petitioner fully understood and appreciated the benefits and risks of going to trial as opposed to those of accepting the guilty plea agreement.

Trial counsel testified that he continued to represent the petitioner after the entry of his guilty pleas in the civil suits that arose out of the same incidents. During that time, from January 1999 through 2003, he also occasionally asked the petitioner to review medical records and give his medical opinion in other medical malpractice cases. Most of their conversations, however, were about the petitioner's civil case, which trial counsel was still handling as late as April 2003. He said that he and the petitioner maintained a good relationship and that the petitioner never expressed dissatisfaction with his representation. At some point in either late 2002 or 2003, however, the petitioner's parents contacted him about filing a post-conviction petition on the petitioner's behalf. Trial counsel said that he told them that he could not do that:

It was mostly from his family. I talked to [the petitioner] about this and he said, well, let them do whatever they want to do or something. He wanted to, it was difficult for me to discuss because his parents really care for him and wanted to help him in every way and they were desperate to try to help him. I wanted to help him, I'd do anything to help him. And towards the end before [post-conviction counsel] came in, there was a mention made of getting some kind of, filing some kind of post conviction petition. But it was very vague and I told them I wasn't going to do it,

couldn't do it, wouldn't do it. And then his mother said that they would talk to other lawyers or something, and then one day I get a call from [post-conviction counsel] and he's involved in the case.

On cross-examination, trial counsel testified that he did not hire a private investigator but investigated the case himself to the best of his ability by reviewing discovery and talking to the petitioner, the petitioner's psychiatrist, and the assistant district attorney. He stated that the assistant district attorney had made him aware of the victims' health conditions, including that two of them were gravely ill, and that there was some discussion about taking the deposition of one of the victims. He stated that the assistant district attorney announced at one point that they were "going to try this thing because [she thought she was] going to lose one of these girls." Trial counsel testified that the possibility of the petitioner's being convicted on all the counts was, in his opinion, "extraordinarily low," as some of the counts were pleaded in the alternative. In his best judgment, the worst case scenario involved the petitioner's being convicted of four counts of aggravated sexual battery and the trial judge ordering consecutive sentences for the counts involving different victims.

On April 20, 2007, the post-conviction court entered an order denying the petition for post-conviction relief. Among other things, the court found that it was "highly doubtful," given trial counsel's experience and reputation, that he had misled the petitioner into believing that he could not file a petition for post-conviction relief. The court, therefore, concluded that the statute of limitations should not be tolled. After consideration of the merits of the petitioner's allegations of ineffective assistance of counsel, the court further concluded that even if due process required tolling of the statute of limitations, the petitioner had failed to meet his burden of demonstrating that trial counsel "breached the standard of care demanded of defense attorneys in their representation of defendants." Thereafter, the petitioner filed a timely appeal to this court.

## ANALYSIS

### I. Post-Conviction Statute of Limitations

The petitioner first contends that the post-conviction court erred in finding that due process considerations did not toll the one-year statute of limitations for bringing a petition for post-conviction relief. He argues that the plain language of his guilty plea agreement, combined with his unrefuted testimony that trial counsel told him his guilty pleas precluded him from seeking any relief from his convictions or sentences, "clearly establish that due process requires" that the statute of limitations be tolled in his case. The petitioner further argues that the post-conviction court incorrectly focused on whether trial counsel misled him into believing he could not file a petition for post-conviction relief rather than whether he was misled into such a belief by the totality of the circumstances, which included trial counsel's continuing representation during and well beyond the one-year statute of limitations period that followed the entry of his guilty pleas. The petitioner maintains that he filed his post-conviction petition within a reasonable amount of time after learning that he had not waived his right to post-conviction relief by entering into the plea agreement with the State.

-9-

The State argues that, short of showing that counsel wilfully misrepresented that he could not file a petition for post-conviction relief, the petitioner cannot demonstrate that due process considerations require that the statute of limitations be tolled. The State further argues that, even if the statute was tolled due to trial counsel's failure to inform the petitioner of his right to file a post-conviction petition, such tolling did not extend to April 13, 2005, the date the petitioner filed his petition.

Tennessee Code Annotated section 40-30-102(a) provides that a petition for post-conviction relief must be filed "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final[.]" The statute contains a specific anti-tolling provision, stating:

> The statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file the action and is a condition upon its exercise. Except as specifically provided in subsections (b) and (c), the right to file a petition for post-conviction relief or a motion to reopen under this chapter shall be extinguished upon the expiration of the limitations period.

Id. Subsection (b) of the statute sets forth three narrow exceptions under which an untimely petition may be considered: (1) when the claim is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized at the time of trial and which requires retrospective application; (2) when the claim is based upon new scientific evidence establishing that the petitioner is innocent; and (3) when a previous conviction that was not a guilty plea and which was used to enhance the petitioner's sentence has been held to be invalid. Id. § 40-30-102(b).

Our supreme court has recognized, however, that in some cases a strict application of the statute of limitations may deprive a petitioner of "'a reasonable opportunity to assert a claim in a meaningful time and manner.'" Williams v. State, 44 S.W.3d 464, 468 (Tenn. 2001) (quoting Seals v. State, 23 S.W.3d 272, 279 (Tenn. 2000)). Thus, in Williams, a majority of our supreme court concluded that due process considerations may have tolled the limitations period for filing a post-conviction petition when the petitioner's counsel misled the petitioner into believing that counsel was continuing the direct appeal process on his behalf. Id. at 471. The petitioner in Williams argued that the statute of limitations should be tolled because trial counsel failed to notify him of his withdrawal from the case or to explain to him his rights for filing a *pro se* Rule 11 application for permission to appeal to the supreme court. Id. at 465. Our supreme court remanded the case to the post-conviction court for an evidentiary hearing, concluding that the record needed further development to determine the circumstances surrounding the petitioner's "understanding of his relationship" with trial counsel:

The question, then, is whether the appellee in this case was, in fact, misled to believe that counsel was continuing the appeals process, thereby requiring the tolling of the limitations period. . . . . The sole inquiry here . . . is whether this limitations period is tolled because of due process concerns surrounding possible attorney misrepresentation. Further development of the record is required to determine the precise circumstances surrounding the appellee's understanding of his relationship to counsel.

Id. at 471. In a footnote, the court clarified that it was "not holding that a petitioner may be excused from filing an untimely post-conviction petition as result of counsel's negligence" but that the inquiry, instead, was "only upon trial and appellate counsel's alleged misrepresentation in failing to properly withdraw from representation and in failing to notify the petitioner that no application for permission to appeal would be filed in this Court." Id. at 468 n.7.

In this case, the post-conviction court made the following findings of fact and conclusions of law in its determination that the petition was time-barred:

Although the petitioner claims that [trial counsel] informed him that he was ineligible to file a petition for post-conviction relief, it is highly doubtful that such a misrepresentation was ever made. At the time of the plea agreement, [trial counsel] had been practicing exclusively in the field of criminal law for over twenty years. He is the author of a series of legal books entitled Tennessee Criminal [P]ractice and Procedure, which has been in publication since 1984. While his understanding of criminal law and procedure is undeniably exceptional, this factor alone does not necessarily mean that any misleading advice could not have been given by counsel.

However, taking into consideration all of the circumstances of this case, it is rather unlikely that [trial counsel] would have advised the petitioner that he was unable to file a petition for post-conviction relief. Based on the testimony provided at the hearing, in conjunction with all other relevant evidence, it does not appear as though [trial counsel] misled the petitioner to believe he was without further legal recourse following the entry of his guilty plea. Thus, due process should not require that the statute of limitations be tolled and the petitioner allowed to proceed with his Petition which was untimely filed.

We respectfully disagree that the petitioner was not misled by the circumstances into a belief "that he was without further legal recourse following the entry of his guilty plea." The guilty plea agreement states in pertinent part:

Counts 2, 4, 6, 7, and 8 are to be retired on the following conditions:

(1)     That within 120 days [the petitioner] will file with the Tennessee Department of Health appropriate papers agreeing to the revocation of his Tennessee medical license; and

(2)     That the guilty pleas as to Counts 1, 3, 5, and 9 shall not be sought by [the petitioner] to be withdrawn or altered in any way; and

(3)     That no petition to modify sentence pursuant to Rule 35 (b), Tennessee Rules of Criminal Procedure is filed by [the petitioner]; and

(4)     That no appeal or challenge to said conviction or sentence is maintained by [the petitioner].

It is undisputed that this waiver of rights included no specific exemption stating that the petitioner was not waiving his right to petition for post-conviction relief. At the evidentiary hearing, the petitioner testified that trial counsel informed him he had waived "all his rights" by entering his guilty pleas. He said that counsel specifically told him that the guilty plea agreement included a waiver of his right to attack the plea agreement or to appeal in any way and that he interpreted this to mean that "it was set in stone and it was done and [he] couldn't appeal." According to the petitioner, trial counsel never mentioned anything to him about his right to file a petition for post-conviction relief.

Neither the State nor post-conviction counsel questioned trial counsel with respect to what he may have told the petitioner concerning the waiver of his right to appeal or challenge the convictions or whether he distinguished between a direct appeal and a petition for post-conviction relief. Trial counsel's only testimony on this subject concerned the advice he gave the petitioner's parents, long after the statute of limitations for filing a post-conviction petition had run, to the effect that he could not and would not file such a post-conviction petition on the petitioner's behalf. Trial counsel, however, corroborated the petitioner's claim that he continued to represent the petitioner in the civil cases associated with the incidents, testifying that he believed that the civil suits were not settled until at least April 2003.

Moreover, trial counsel's memoranda, notes, and letters associated with the case, which were admitted as part of a collective exhibit at the hearing, show that he and the petitioner continued to enjoy regular, congenial correspondence and contact through at least the middle of 2003, including correspondence relating not just to the petitioner's help in evaluating other medical malpractice cases but also to the terms and conditions of the petitioner's service of his sentence. In several letters, trial counsel responded to the petitioner's apparent complaints or requests regarding the status of his incarceration. In one, dated April 16, 2001, trial counsel advised the petitioner that he "could always raise hell" about the conditions of the petitioner's incarceration but that it would only serve to get him transferred to a prison near Memphis. In another letter, dated September 26, 2002, trial counsel advised that he had discussed with the petitioner's mother the potential civil litigation and also explained to her that there was "no practical way to get any other reduction in [the petitioner's]

-12-

sentence." In a letter dated September 15, 2003, trial counsel told the petitioner that Vanderbilt Hospital had refused to provide a lawyer for him in the civil suit, reminded him that their contract "specifically excluded that civil litigation," and advised that he had civil lawyers in his firm who could handle the matter and that he, himself, was "as familiar with [the petitioner's] case as anyone." Finally, in a September 17, 2003, letter, trial counsel advised the petitioner that the petitioner's father had authorized him to represent the petitioner in the civil suit recently filed against him.

Based on these unique circumstances, we conclude that due process requires that the statute of limitations be tolled. Unlike the more common scenario where counsel's representation comes to a close following the entry of a defendant's guilty plea, trial counsel not only represented the petitioner in the civil suits arising out of the same criminal episodes but also continued to respond and communicate with the petitioner about the terms and conditions of his criminal sentence. As the petitioner points out, there is nothing in the record to show that trial counsel ever made any formal effort to withdraw from representation. We do not think it was unreasonable in such a situation for the petitioner to have believed that trial counsel, whom he thought would continue to represent him throughout the entire term of his sentence, would have informed him that he had not waived his right to petition for post-conviction relief. Nothing in the record contradicts his testimony that trial counsel never said anything to him about his right to file a post-conviction petition or the statute of limitations for doing so. The letter trial counsel sent to the petitioner explaining the ramifications and consequences of his guilty plea agreement is silent on the subject.

We agree with the petitioner that the key inquiry is whether, under the totality of the circumstances, the petitioner was misled into believing that his guilty pleas included a waiver of his right to petition for post-conviction relief. See Williams, 44 S.W.3d at 471 ("The sole inquiry here . . . is whether this limitations period is tolled because of due process concerns surrounding possible attorney misrepresentation."). In Stokes v. State, 146 S.W.3d 56 (Tenn. 2004), our supreme court summarized the holding in Williams as follows:

> In Williams, misrepresentation by defendant's counsel led to a failure to file an application for permission to appeal to this Court following the decision of the Court of Criminal Appeals on direct appeal. The defendant believed that the case had been pending before this Court, and by the time he filed a petition for post-conviction relief, his petition was dismissed as time-barred. We held that if the defendant was under the impression that a Rule 11 application was pending, he was effectively precluded from filing a timely petition for post-conviction relief, and that the attorney's misrepresentation and failure to withdraw as counsel warranted a tolling of the statute of limitations.

Id. at 61. In Sample v. State, 82 S.W.3d 267, 273-74 (Tenn. 2002), our supreme court stated: "[W]e have consistently said that the principles of due process are flexible and require balancing of a petitioner's liberty interests against the State's finality interests on a case by case basis." Here, the petitioner was misled by the all-inclusive language of the waiver in his guilty plea agreement, by counsel's explanation that he was waiving "all his rights" by signing the agreement, and by counsel's

-13-

continuing representation into believing that he had no right to file a petition for post-conviction relief. He was, thus, deprived of a reasonable opportunity to assert his claims of ineffective assistance of counsel in a meaningful time and manner. See Williams, 44 S.W.3d at 468.

We further agree with the petitioner that the nine-month delay between the time that he first learned of his right to file a post-conviction petition and the filing of the petition was not unreasonable. See Sample, 82 S.W.3d at 276 (concluding that sixteen-month delay between time petitioner learned of exculpatory evidence withheld by the State and filing of his petition was not unreasonable under the circumstances of the case); Williams, 44 S.W.3d at 471 (declining to "arbitrarily determine what length of time constitutes 'enough time' for a defendant to pursue post-conviction appellate review"). We conclude that, under the unique circumstances presented by this case, due process considerations require that the statute of limitations be tolled

## II. Claims of Ineffective Assistance of Counsel

The petitioner next contends that the post-conviction court erred in finding that he did not meet his burden of showing that he was denied the effective assistance of trial counsel. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998).

The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999). To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App.1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee cases). The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

-14-

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason, courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner first argues that trial counsel was ineffective for failing to properly advise him of the maximum possible sentence he would receive if convicted of all counts of the indictment at trial. He asserts that trial counsel's prediction of a possible 108-year sentence was erroneous and unrealistic and that it influenced him into accepting the plea agreement. The post-conviction court made the following findings and conclusions with respect to this claim:

> The petitioner asserts that [trial counsel] told him he was facing a possible maximum sentence of 108 years. [Trial counsel] stated that he would always tell his clients what the maximum theoretical sentence could be, along with what he thought was a more probable result if convicted. He testified that he told the petitioner if he were convicted of the offenses, he was more likely to receive an effective sentence of somewhere between thirty and fifty years.
>
> When there exists some conflict in testimony, the credibility and weight of witnesses' testimony is to be resolved by the post-conviction court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Considering the professionalism, experience and legal knowledge of [trial counsel], the Court tends to favor his testimony over that of the petitioner. Furthermore, this sort of educated guesswork is often done by defense attorneys in rendering professional opinions of possible outcomes of criminal cases. This issue is without merit.

-15-

We conclude that the record supports these findings and conclusions of the post-conviction court. Trial counsel explained that he always informed his clients of the theoretical maximum sentence but also gave them his best professional opinion as to the most probable sentence. In this case, he specifically told the petitioner, and put in writing, his belief that the most probable sentence the petitioner would receive if convicted at trial would be one in the range of thirty to forty years, which would mean that he would spend the rest of his effective life in prison. This information is reflected in the lengthy January 5, 1999, letter trial counsel sent to the petitioner, explaining the ramifications of the proposed guilty plea agreement:

> You and I have discussed this on numerous occasions. I feel that I could successfully defend the rape charge, given the weakness of that allegation and your strong denial that it ever occurred. It is conceivable that we could defeat the earliest allegation. Thus, there is a possibility of an acquittal in as many as two of the victims. However, I do not believe, in my best professional opinion, that I could successfully defend all four cases.

> Given the strength of the evidence against you, I feel that a conviction on at least two counts or more is significant. This could result in sentences at least as great as you are accepting in this plea agreement with a significant probability of sentences as high as 30 or 40 years. For a variety of reasons, I believe that any convictions against you in a jury trial would run consecutively and could result in your confinement for the rest of your meaningful life.

During cross-examination, trial counsel testified that his professional opinion of the "worst case probable scenario," of which he informed the petitioner, was that the petitioner would be convicted of four counts of aggravated sexual battery and that the trial judge would run each sentence based on a different victim consecutively, for a total of approximately forty-eight years. The petitioner cites this testimony to argue that the post-conviction court "should have found that trial counsel advised [the petitioner] that [he] would receive an effective sentence of 48 to 50 years or more." This view, however, ignores trial counsel's direct examination testimony, as well as the information he conveyed to the petitioner by letter, recited above, about having informed the petitioner of the "most probable" sentence he would receive and why.

In the context of this claim, the petitioner also argues that trial counsel was deficient for failing to recognize and advise the petitioner "of the effect of the multiplicitous indictment returned against him," and for assuming that the petitioner would receive enhanced and consecutive sentencing. Trial counsel, however, made it clear that he thought it very unlikely, as he informed the petitioner, that the petitioner would be convicted on every one of the counts contained in the indictment. In his letter to the petitioner, trial counsel offered sound rationales for his belief that the petitioner's status as a physician, as well as the enhanced vulnerability of the victims because they were suffering from severe physical disabilities, would result in the application of several enhancement factors to the petitioner's sentence. The petitioner has failed to show that trial counsel was deficient in his representation in this respect or that he would not have pled guilty had it not

-16-

been for counsel's alleged misinformation. Accordingly, we conclude that the petitioner is not entitled to relief on the basis of this claim.

The petitioner next argues that trial counsel was ineffective for failing to properly investigate the allegations contained in the indictment. Specifically, he argues that trial counsel was deficient for not having him undergo an independent psychiatric evaluation and that he was prejudiced as a result because he would not have entered into the plea agreement had he known about the possible defenses and mitigating circumstances associated with his diagnosis of voyeurism.

In denying relief on the basis of this claim, the post-conviction stated, in pertinent part:

The psychiatric evaluations conducted both before and after conviction, along with the petitioner's statements, revealed that he was suffering from a condition involving sexual deviance. Dr. Berlin even stated in the evidentiary hearing on the Petition for Post-Conviction Relief that a person suffering from voyeurism "experiences intense recurrent erotically arousing, that's sexually arousing fantasies and urges about looking at an unsuspecting, naked stranger." . . . Testimony proving the existence of such a disorder within the petitioner which spurs sexual fantasy and arousal, in conjunction with the facts of the case, lead the Court to believe that a jury could have reasonably construed the touching by the petitioner as being for the purpose of sexual arousal or gratification.

Furthermore, [trial counsel] testified that his main concerns were whether the petitioner was competent to stand trial in the matter and whether there existed any defenses in that respect. The psychiatric evaluation conducted by Dr. R[a]gan concluded that the petitioner was competent, but there was some mental illness involving sexual deviance. However, [trial counsel] opined that there was an insufficient foundation upon which a mental health defense could be based. Furthermore, he stated that such a defense would be quite dangerous, as they can be "fraught with disaster." Due to the fact that the petitioner had made an inculpatory statement, coupled with the accusations made by the victims, [trial counsel] found the case to be difficult to defend.

It is not the Court's function to "'second guess' tactical and strategic choices pertaining to defense measures or to measure a defense attorney's representation by '20-20 hindsight.'" Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997) (quoting Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)). Based on [trial counsel's] testimony and his professional assessment of the damaging evidence against the petitioner, the Court is of the opinion that his legal representation in this regard was adequate. This issue is without merit.

The record fully supports the findings and conclusions of the post-conviction court. When reviewing a claim of ineffective assistance of counsel, we are mindful that we must indulge a strong

presumption that counsel's conduct fell within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by counsel unless those choices were uninformed because of inadequate preparation. See Hellard, 629 S.W.2d at 9. Trial counsel, an experienced and very competent criminal defense attorney, testified that he did not pursue a psychiatric defense because, in his professional opinion, the information uncovered by Dr. Ragan hurt rather than helped the petitioner's case. He fully explained his reasoning, testifying that the things Dr. Ragan told him about the petitioner supported the State's case. Dr. Ragan informed him, for example, that the petitioner engaged in high risk activities to stimulate himself, was sexually fascinated with the bodies of young girls, and had married an Asian woman because she looked like a young girl. Dr. Ragan never distinguished between the petitioner's interest in looking as opposed to touching, and the petitioner admitted to trial counsel that he had performed medical examinations on the victims.

Even if the petitioner had been diagnosed with voyeurism in 1999, we fail to see that it would have been helpful to his defense. For the purposes of this case, the offense of aggravated sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4) (1997 & 2006). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6). As the post-conviction court noted in its order, this court has previously rejected similar arguments from other defendants based on the fact that the statute requires only intentional touching that can be reasonably construed as being for the purposes of sexual gratification. See State v. Wesley Earl Brown, No. M2003-02804-CCA-R3-CD, 2005 WL 1412088, at *6 (Tenn. Crim. App. June 16, 2005), perm. to appeal denied (Tenn. Dec. 5, 2005); State v. Roy Chisenhall, No. M2003-00956-CCA-R3-CD, 2004 WL 1217118, at *3 (Tenn. Crim. App. June 3, 2004). The petitioner's statement to police, in which he admitted that he was sexually attracted to adolescent girls and had given examinations to the victims, who were not his patients, would be more than enough for a jury to reasonably conclude that the petitioner touched the victims for the purpose of sexual arousal or gratification.

The petitioner additionally argues that trial counsel was deficient, thereby depriving the petitioner of the ability to enter knowing and voluntary guilty pleas, by the fact trial counsel did not retain an investigator, interview eyewitnesses, have an expert analyze the videotape purporting to show the petitioner on the victims' hospital floor, or procure school, medical, legal or other records of the petitioner, victims, or other witnesses in the case. Trial counsel, however, testified that he received adequate discovery from the assistant district attorney, including information about the victims, and that he investigated the case to the best of his ability by reviewing the evidence and holding conversations with the petitioner, the assistant district attorney, and the petitioner's psychiatrist. The petitioner has not met his burden of showing that trial counsel was deficient in his investigation or that he would not have pled guilty were it not for counsel's alleged deficiencies in this regard. We conclude, therefore, that the petitioner is not entitled to relief on the basis of this claim.

The petitioner next argues that trial counsel was ineffective for failing to properly advise him about the impact of the unavailability of two of the victims. He notes that two of the victims are now deceased, one having died on January 26, 2000, and the other on September 19, 2000, and asserts that, given the serious health conditions of all four victims, "[i]t is likely that none of the victims could have testified at trial." He contends that had trial counsel informed him that the victims' statements to police could not be used against him if they were unavailable to testify at trial, he would not have rushed to enter the plea agreement but instead would have insisted on proceeding to trial.

The post-conviction court made the following findings and conclusions with respect to this claim:

> From the proof adduced in this case, it is apparent that all of the victims were alive prior to the petitioner's conviction. As previously mentioned, [the assistant district attorney] had voiced her concern for trying the matter as soon as possible so that all of the victims would be available, either for testifying in person at trial or being deposed prior thereto. The petitioner's assertion in this particular facet of the case is rather speculative and unfounded. Because the petitioner has failed to prove such allegation by clear and convincing evidence, this issue is without merit.

The record supports the findings and conclusions of the post-conviction court. Trial counsel testified that the prosecutor was very conscious of the precarious health of at least one of the victims and expressed her intention of either taking the victims' depositions or expediting the case to trial. There is nothing in the record to show that either could not have occurred. The petitioner has not met his burden of showing that counsel was deficient in this respect or that he would not have pled guilty were it not for counsel's alleged deficiency in failing to inform him of the impact of the potential unavailability of the victims at trial. We conclude, therefore, that the petitioner is not entitled to relief on the basis of this claim.

The petitioner next argues that trial counsel was deficient for failing to advise him of the trial court's inability under Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), to enhance his sentences based on factors not admitted by the petitioner or found by the jury. The post-conviction court rejected this claim, noting, among other things, that Blakely was not released until 2004, over five years after the entry of the petitioner's guilty pleas. We agree that the petitioner has not shown that trial counsel was deficient for failing to anticipate the holding in Blakely. We conclude, therefore, that the petitioner is not entitled to relief on the basis of this claim.

Lastly, the petitioner argues that the cumulative effect of trial counsel's alleged deficiencies in representation warrants that he be afforded post-conviction relief. We respectfully disagree.

-19-

## **CONCLUSION**

We conclude that due process concerns require that the statute of limitations be tolled under the unique circumstances presented by this case. We further conclude that the petitioner has not met his burden of showing that he received ineffective assistance of trial counsel. Accordingly, we affirm the denial of his petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE